[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-13235

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 20, 2011
JOHN LEY
CLERK

D. C. Docket No. 1:11-cv-02324-SCJ

ANDREW GRANT DEYOUNG,

Plaintiff-Appellant,

versus

BRIAN OWENS, Commissioner,
Georgia Department of Corrections,
CARL HUMPHREY, Warden,
Georgia Diagnostic and Classification Prison,
OTHER UNKNOWN EMPLOYEES AND AGENTS,
Georgia Department of Corrections,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(July 20, 2011)

Before DUBINA, Chief Judge, EDMONDSON and HULL, Circuit Judges.

HULL, Circuit Judge:

Georgia death-row inmate Andrew DeYoung brutally murdered his mother, his father, and his fourteen year old sister, Sarah, and was convicted and sentenced to death. See, e.g., DeYoung v. Schofield, 609 F.3d 1260, 1262 (11th Cir. 2010), cert. denied, 131 S. Ct. 1691 (2011).[1]

DeYoung is scheduled to be executed by lethal injection at 7:00 p.m. on Wednesday, July 20, 2011. On Friday, July 15, 2011, DeYoung filed a 42 U.S.C. § 1983 action alleging that the State of Georgia's method of lethal execution will violate his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to equal protection. DeYoung moved for a temporary restraining order ("TRO") and stay of execution, as well as further declaratory and injunctive relief seeking to prevent the State from executing him using its current lethal injection protocol.

On Monday, July 18, 2011, the State moved to dismiss, arguing that DeYoung's claims are barred by the statute of limitations and fail to state a claim

---

[1]DeYoung's convictions and death sentences were upheld on direct appeal and the United States Supreme Court denied certiorari review. DeYoung v. State, 493 S.E.2d 157 (Ga. 1997), cert. denied, 523 U.S. 1141, 118 S. Ct. 1848 (1998). DeYoung unsuccessfully attacked his convictions and death sentences in state and federal habeas proceedings. See generally DeYoung v. Schofield, 609 F.3d at 1275-82, 1291.

2

upon which relief can be granted. After holding an evidentiary hearing on Tuesday, July 19, 2011, the district court entered a thorough 28-page order on July 20, 2011, denying DeYoung's motions for a TRO and stay of execution and granting the State's motion to dismiss. Thereafter, the district court also denied DeYoung's motion for stay of execution pending appeal and separate motion to alter judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.

DeYoung appealed and filed a motion for a stay of execution in this Court. After review, we deny DeYoung's motion for a stay of execution.

## I. BACKGROUND

### A. Georgia's Lethal Injection Protocol

Georgia law provides that "[a]ll persons who have been convicted of a capital offense and have had imposed upon them a sentence of death shall suffer such punishment by lethal injection," which it defines as "the continuous intravenous injection of a substance or substances sufficient to cause death into the body of the person sentenced to death until such person is dead." O.C.G.A. § 17-10-38(a) (2000).

Under the lethal injection protocol promulgated by the Georgia Department of Corrections ("GDOC"), death-sentenced prisoners are administered a succession of three chemicals in the following order: (1) 5,000 milligrams of

pentobarbital, an anesthetic that is administered to render the inmate unconscious; (2) 50 milligrams of pancuronium bromide, a paralytic agent; and (3) 120 milliequivalents of potassium chloride, which induces cardiac arrest, causing the inmate's death.

The protocol calls for an IV nurse to examine the inmate to ensure he is unconscious before the pancuronium bromide is administered. If the inmate is not unconscious, the protocol requires GDOC staff to repeat the administration of pentobarbital and subsequent consciousness check until the inmate is deemed to be unconscious.

Until May 13, 2011, the anesthetic used was sodium thiopental (a/k/a sodium pentothal). Lack of sodium thiopental availability led Georgia on May 13, 2011 to switch to the use of pentobarbital as the anesthetic in its lethal injection protocol.

**B.    DeYoung's Claims**

DeYoung's challenge to the State's method of execution is two-pronged. First, he contends the GDOC's lethal injection protocol violates the Eighth Amendment's prohibition of cruel and unusual punishment. Specifically, DeYoung alleges, among other things, that the use of pentobarbital as an anesthetic poses a substantial risk of serious harm to him because: (1)

4

pentobarbital has been insufficiently tested for induction of anesthetic coma in fully conscious persons, and (2) in prior executions using pentobarbital, the drug did not painlessly anesthetize the prisoners.

Second, DeYoung contends the GDOC's lethal injection protocol, as written and as administered in practice, violates his right to equal protection under the Fourteenth Amendment because: (1) the written protocol contains gaps in the execution procedure that the GDOC fills in on an ad hoc basis, leading to disparate treatment for different inmates; and (2) the GDOC deviates from the written protocol, similarly leading to disparate treatment for different inmates. The State promptly filed a motion to dismiss on numerous grounds, including the statute of limitations and failure to state a claim.

## C.   District Court's Order

In granting the State's motion to dismiss, the district court found: (1) DeYoung's claims accrued in 2001, when Georgia adopted lethal injection as its method of execution; (2) Georgia's substitution of pentobarbital for sodium thiopental did not constitute a significant alteration to the protocol that would re-set the limitations period; (3) GDOC's alleged deviations from the written protocol began no later than May 2008; and (4) DeYoung's two-year limitations period expired eight years before he filed this action.

Alternatively, even if the statute of limitations did not bar his § 1983 action, the district court concluded that DeYoung failed to state a claim upon which relief could be granted. As to the Eighth Amendment claim, the district court found, among other things: (1) DeYoung's evidence failed to show that the administration of pentobarbital inflicts serious harm; (2) DeYoung has not proven that former inmate Roy Blankenship (who on June 23, 2011 was executed by the State of Georgia using pentobarbital as the anesthetic) suffered pain or serious harm; (3) that DeYoung's expert "failed to provide a medical explanation for why pentobarbital might have caused Blankenship pain" and "[t]o the contrary, Dr. Waisel testified that a patient will not feel pain at the moment when a drug is introduced intravenously unless it is a drug, such as potassium chloride, which causes a burning sensation"; (4) DeYoung presented no evidence indicating a 5,000-milligram dose of pentobarbital fails to cause unconsciousness; (5) a consciousness check was performed on Roy Blankenship prior to injection of the second drug pancuronium bromide as required by Georgia's legal injection procedure; and (6) executions in Georgia do not proceed with the second drug until the inmate is unconscious and "DeYoung['s] execution cannot proceed until he is unconscious." Thus, DeYoung did not show that Georgia's use of pentobarbital creates a substantial risk of serious harm to inmates.

6

As to DeYoung's Fourteenth Amendment claim, the district court found: (1) there was no support for "DeYoung's novel proposition" that the Equal Protection Clause requires the State to "produce a written protocol that is detailed enough to insure that every execution is precisely identical"; (2) the "deviations" from the written protocol of which DeYoung complains (including the use of nurses to insert IVs, the presence of two nurses instead of one, performance of numerous consciousness checks, and checks for IV infiltration or leakage) are consistent with Georgia's written protocol and "enure to the benefit" of inmates; and (3) the benign "deviations" are rationally related to the State's interest in safeguarding the execution process. Thus, DeYoung did not show an equal protection violation.

The district court denied DeYoung's request for a TRO and stay of execution because "he has absolutely no likelihood of success on the merits."

## II. DISCUSSION

On appeal, DeYoung moves this Court for a stay of execution and also appeals the district court's denial of a stay.[2] A stay of execution is equitable relief

---

[2]We review the district court's denial of DeYoung's motions for a TRO and stay of execution for abuse of discretion. Powell v. Thomas, No. 11-12238, 641 F.3d 1255, 1257 (11th Cir. May 19, 2011), cert. denied, 131 S. Ct. 2487 (2011); Ingram v. Ault, 50 F.3d 898, 900 (11th Cir. 1995). "We review the district court's grant of a motion to dismiss de novo, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." Powell v. Thomas, No. 11-12613, — F.3d —, 2011 WL 2437498, at *1 (11th Cir. Jun. 15, 2011).

which this Court may grant "only if the moving party shows that: (1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; and (4) if issued, the injunction would not be adverse to the public interest." Powell v. Thomas, No. 11-12238, 641 F.3d 1255, 1257 (11th Cir. May 19, 2011), cert. denied, 131 S. Ct. 2487 (2011). We conclude that DeYoung is not entitled to a stay because he has not demonstrated, among other things, a substantial likelihood he will succeed on the merits of his claims. DeYoung's claims are barred by the statute of limitations and, even if they were timely, they fail as a matter of law. At a minimum, DeYoung has not established a substantial likelihood of success on the merits of his claims.

## A.    Statute of Limitations

Section 1983 claims "are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought." Powell v. Thomas, No. 11-12613, — F.3d —, 2011 WL 2437498, at *2 (11th Cir. Jun. 15, 2011) (quotation marks omitted).[3] Georgia has a two-year

---

[3]We rely on the two Powell opinions throughout this opinion. Henceforth, we refer to the opinion in case No. 11-12238 as Powell (Williams) because that appeal concerned the claims of intervenor Jason Oric Williams. We refer to the opinion in case No. 11-12613 as Powell because that appeal concerned the claims of named plaintiff Eddie D. Powell.

statute of limitations for personal injury actions. O.C.G.A. § 9-3-33. The two-year limitations period begins to run on "the date on which state review is complete, or the date on which the capital litigant becomes subject to a new or substantially changed execution protocol," whichever occurs later. McNair v. Allen, 515 F.3d 1168, 1174 (11th Cir. 2008).

DeYoung's state review became complete on May 26, 1998, the date the United States Supreme Court denied DeYoung's petition for certiorari on direct appeal. See DeYoung v. Georgia, 523 U.S. 1141, 118 S. Ct. 1848 (1998). DeYoung last became subject to a new or substantially changed execution protocol on October 5, 2001, when the Georgia Supreme Court declared that execution by electrocution violated the state constitution and directed that "any future executions of death sentences in Georgia be carried out by lethal injection in accordance with O.C.G.A. § 17-10-38, as amended." Dawson v. State, 554 S.E.2d 137, 139 (Ga. 2001). Thus, the two-year statute of limitations began to run on October 5, 2001, and expired nearly eight years before DeYoung filed this action.

DeYoung argues that Georgia's May 13, 2011 substitution of pentobarbital for sodium thiopental as the anesthetic in its lethal injection protocol resulted in a "substantially changed execution protocol." We already rejected an identical

claim as to Alabama's recent switch from sodium thiopental to pentobarbital. See

Powell, 2011 WL 2437498, at *2-4 (rejecting Eighth Amendment challenge to

method of execution on statute of limitations grounds, stating, "this very

argument—that the ADOC's change from sodium thiopental to pentobarbital, is a

substantial or significant change in the lethal injection protocol—was rejected by a

panel of this Court in Powell (Williams)," and "Powell's attempts to circumvent

the holding of Powell (Williams) fall flat"); see also Powell (Williams), 641 F.3d

at 1258 ("The replacement of sodium thiopental with pentobarbital does not

constitute a significant alteration in the ADOC's lethal injection protocol . . . .").

DeYoung acknowledges the Powell decision is on point, but argues that the

evidence he proffered in this record undermines the premise of Powell. However,

"the mere act of proffering additional reasons not expressly considered previously

will not open the door to reconsideration of the question by a second panel." Smith

v. GTE Corp., 236 F.3d 1292, 1302 (11th Cir. 2001) (quotation marks and ellipsis

omitted). And in any event, the additional evidence DeYoung proffers does not,

for the reasons set forth below, undermine Powell's conclusion.

**B.     Merits of the Claims**

      1.     Eighth Amendment Claim

To state an Eighth Amendment claim, DeYoung must "demonstrate that (1) the State is being deliberately indifferent (2) to a condition that poses a substantial risk of serious harm to him." Powell (Williams), 641 F.3d at 1257. In the lethal injection context, this standard requires an inmate to show "'an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment.'" Id. (quoting Baze v. Rees, 553 U.S. 35, 50, 128 S. Ct. 1520, 1531 (2008) (plurality opinion)). "[T]he risk must be sure or very likely to cause . . . needless suffering." Baze, 553 U.S. at 50, 128 S. Ct. at 1531 (plurality opinion) (quotation marks omitted). The evidence DeYoung provides does not satisfy this Eighth Amendment standard.

A significant part of DeYoung's Eighth Amendment claim in his § 1983 complaint is based on the State of Georgia's execution of Roy Blankenship on June 23, 2011. DeYoung largely points to events surrounding the Blankenship execution as the basis for his Eighth Amendment claim. DeYoung attempts to use evidence of the Blankenship execution to show two things: (1) that administration of 5,000 milligrams of pentobarbital to an inmate causes needless suffering in and

11

of itself, and (2) that the pentobarbital dose does not adequately render an inmate unconscious, thereby leading to needless suffering.[4]

After hearing testimony by DeYoung's expert and reviewing multiple affidavits, the district court found (1) that DeYoung failed to establish that pentobarbital caused Blankenship any pain during his execution given that DeYoung's expert failed to provide a medical explanation for why pentobarbital might have caused Blankenship pain, or will cause pain in executions; and (2) that, in any event, DeYoung "has absolutely no likelihood of success on the merits" of his claims.

As the district court aptly found, DeYoung's medical expert, David B. Waisel, M.D., formulated his opinion based on witnesses' accounts of the execution and some movement by Blankenship during the initial three minutes at the start of the execution process. The witnesses disagree about two things: (1) the type of movement; and (2) whether it occurred before or during the administration of the pentobarbital.

---

[4]DeYoung also alleges that pentobarbital has not been sufficiently tested for its ability to cause an anesthetic coma in fully conscious persons. However, DeYoung's expert candidly admits he does not know how the State's dosage of pentobarbital will affect inmates because he claims there is no way to know. This asserted lack of knowledge obviously cannot satisfy DeYoung's burden of affirmatively showing that a substantial risk of serious harm exists. Thus, DeYoung's evidence focuses largely on the Blankenship execution.

As to the movement, witnesses describe it in very different ways. To some, Blankenship was just looking up and watching what was occurring, looked at his left arm (which had an IV saline drip) and then 30 to 60 seconds later looked toward his right arm where the administration of the pentobarbital was starting. To others, Blankenship appeared to grimace, or have a startled face, or jerked his arm twice, or had his mouth open and tried to mouth something.

As to timing, some believe all the movement occurred before the pentobarbital was started in the IV and others appear to think that it was after the pentobarbital was started in the IV. In any event, the movement occurred only a few times and all briefly during a total time period of three minutes. The evidence undisputedly shows that Blankenship became still and was unconscious before the second drug was administered.

Even assuming Blankenship's movement was during the administration of the pentobarbital or right after, the evidence in this record does not establish a substantial risk of serious harm from the pentobarbital, or even that Blankenship necessarily suffered any harm, much less serious harm. First, as the district court pointed out, "Dr. Waisel entirely failed to provide a medical explanation for why pentobarbital might have caused Blankenship pain. To the contrary, Dr. Waisel testified that a patient will not feel pain at the moment when a drug is introduced

13

intravenously unless it is a drug, such as potassium chloride, which causes a burning sensation."

Second, the district court noted that Dr. Waisel admitted that "any 'suffering' was short lived as it clearly ended within a few minutes—three minutes at the most—after the pentobarbital was injected." The Eighth Amendment does not protect against all harm, only serious harm; and it does not prohibit all risks, only substantial risks. "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." Baze, 553 U.S. at 50, 128 S. Ct. at 1531 (plurality opinion). In any event, Dr. Waisel was not present at the Blankenship execution; rather, he opines from the witnesses' varied descriptions of Blankenship's movements that those movements were a sign of "discomfort," which Dr. Waisel termed "suffering." Dr. Waisel acknowledged that no one reported any movement by Blankenship after the nurse's consciousness check. Further, Blankenship's autopsy revealed no evidence of trauma. The catheters were inside Blankenship's veins and the veins were not burst or broken. There was no infiltration of fluid in the soft tissue of the right arm near the catheter site.

Notably too, DeYoung presented no evidence to show that unconsciousness is not achieved after the complete administration of a 5000-mg dose of pentobarbital.[5]

All parties agree that the purpose of the anesthetic in Georgia's three-drug lethal injection protocol is to render the inmate unconscious <u>before administration of the second and third drugs</u>. As the record demonstrates, and the district court found, a consciousness check was performed on Blankenship after he was administered the pentobarbital and prior to injection of the second drug pancuronium bromide, as Georgia's lethal injection protocol requires. It is clear that Blankenship's execution did not proceed to the second drug until after he was fully unconscious. And as the district court found, DeYoung's execution, or any other under the Georgia protocol, cannot proceed until he is unconscious. To the contrary, Georgia's protocol specifically provides that GDOC officials will not administer the pancuronium bromide but will instead administer more

_____

[5]In addition to the evidence concerning the Blankenship execution, DeYoung submitted some evidence regarding the execution of Eddie Powell, who was recently executed in Alabama using a pentobarbital-pancuronium bromide-potassium chloride protocol. DeYoung's evidence about the Powell execution does not change our conclusion. Powell's attorney, who witnessed Powell's execution, testified that about a minute after the Chaplain finished praying with Powell, Powell (1) lifted his head, (2) looked confused, and (3) clenched his teeth and flexed his neck muscles as if he were extremely angry or tense or nervous. After about a minute more, Powell lay back down, closed his eyes, and did not move again. Powell's counsel did not know at what time the various chemical were administered.

anesthetic—and conduct more consciousness checks—until the inmate has been shown to be unconscious.

DeYoung has wholly failed to show that pentobarbital, once fully administered and allowed to act, is ineffective as an anesthetic. As the district court succinctly found, Georgia's "use of pentobarbital does not create a substantial risk of serious harm to inmates."

2.      Fourteenth Amendment Claim[6]

To state an equal protection claim, DeYoung must show that the State will treat him disparately from other similarly situated persons. See Amnesty Int'l, USA v. Battle, 559 F.3d 1170, 1180 (11th Cir. 2009). Because he does not allege the disparate treatment burdens his fundamental rights or is based on his membership in a suspect class, DeYoung must show that the disparate treatment is not rationally related to a legitimate government interest. Leib v. Hillsborough Cnty. Pub. Transp. Comm'n, 558 F.3d 1301, 1306 (11th Cir. 2009).

DeYoung's equal protection claim asserts, essentially, that Georgia's written lethal injection protocol is insufficiently specific and thus the GDOC deviates from it on an ad hoc basis, leading to disparate treatment for different

---

[6]DeYoung does not appear to raise any Fourteenth Amendment arguments in support of his motion for a stay of execution. Nevertheless, given the gravity of this appeal and out of an abundance of caution, we address this claim as well.

16

inmates. DeYoung has not shown a substantial likelihood of success on the merits of this claim.

First, as the district court correctly noted, there is no support for DeYoung's "novel proposition" that the Equal Protection Clause requires a written execution protocol sufficiently detailed to ensure that every execution is performed in a precisely identical manner. Moreover, our review of the Georgia lethal injection protocol reveals it to be highly detailed as to nearly every aspect of the execution process.

Second, the "deviations" DeYoung cites that lead to the disparate treatment of which he complains are all ways by which the GDOC provides more protection for an inmate and the execution process than the written protocol provides.[7] The State has a legitimate interest in ensuring that its executions occur in a thorough manner with maximum inmate safeguards, and the alleged deviations from the written protocol are rationally related to that interest. DeYoung has not shown a substantial likelihood of success on his equal protection claim.

### III. CONCLUSION

---

[7]These alleged deviations include having two nurses present (whereas the protocol requires only one), performance of numerous consciousness checks (the protocol requires only one successful consciousness check before administration of pancuronium bromide), and checks for IV infiltration or leakage.

17

For all of these reasons, the Court concludes DeYoung has not demonstrated a substantial likelihood of success on the merits of his claims. Therefore, the Court denies DeYoung's motion for a stay of execution in this Court. The Court also concludes that the district court did not abuse its discretion in denying a stay and this Court affirms.

**MOTION FOR STAY OF EXECUTION DENIED; DISTRICT COURT'S ORDER DENYING STAY OF EXECUTION AFFIRMED.**